Filed 11/14/22  Christenfeld v. Regents of the University of Cal. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| NICHOLAS CHRISTENFELD,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A162690<br><br>(Alameda County<br>Super. Ct. No. RG19036427) |

Appellant Nicholas Christenfeld, a psychology professor, participated in a process that resulted in the graduate-school admission of a student with whom he was having a sexual and romantic relationship.  After this was discovered, he and the university entered into an informal agreement in which he agreed to certain terms, one of which provided that disciplinary charges would be filed if the university received further credible reports that he violated the faculty's code of conduct or the university's sexual harassment policy.

Years later, Christenfeld sent unsolicited pornographic images to a different female student using his university email account, although the parties agree that the student was not the intended recipient.  The university filed disciplinary charges seeking to dismiss him.  After a disciplinary committee agreed with that penalty and it was adopted by respondent

1

Regents of the University of California (the Regents), Christenfeld sought a petition for a writ of administrative mandate, which the trial court denied. In this appeal, Christenfeld argues that he did not receive a fair disciplinary hearing, that the disciplinary committee's findings were not supported by sufficient evidence, and that his termination was an abuse of discretion. We affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Christenfeld began working at the University of California, San Diego (UC San Diego or the university) in 1991. He was a professor in the psychology department.

Jane Doe 1 transferred to UC San Diego from community college in fall 2010. During her first semester there, she took an introduction to social psychology course taught by Christenfeld. Later, in winter 2012, Jane Doe 1 took a smaller seminar with Christenfeld. She began visiting him during his office hours, where they would talk for several hours about social psychology, how she might prepare to attend graduate school, and other topics. Christenfeld is 25 years older that Jane Doe 1, which meant that at the time he was more than twice her age. They sometimes discussed sexuality (the subject of her honors thesis), which led to more generalized discussions about sexual topics, as well as flirting.

After the course ended, the two continued to communicate by email, and in April 2012 they met for the first time outside office hours. They quickly began a romantic and sexual relationship, which spanned the next four years.

A different professor, who was Jane Doe 1's primary academic mentor and her honors thesis advisor, let Doe 1 use office space in her lab.

2

Christenfeld and Jane Doe 1 had sex dozens of time in that space because the room was bigger and more private than Christenfeld's office, and Jane Doe 1 did not often see the professor in that lab.

In November or December 2012, Jane Doe 1 applied to the UC San Diego psychology department's Ph.D. program. Christenfeld did not want to "officially" recuse himself from her admission process, but they discussed how he could avoid influencing her admission to the program.

UC San Diego's psychology department had a total of around six areas of study, including developmental psychology and cognitive psychology. Jane Doe 1 was interested in social psychology, one of several areas of study within psychology. Christenfeld was one of four social psychology faculty members in a department of around 25 people.

One-on-one interviews for prospective psychology graduate students took place in February 2013. Jane Doe 1 and Christenfeld knew in advance that he was one of three people who would separately be interviewing her, though neither one of them requested that he be her interviewer. Christenfeld interviewed 14 people that year, or more than twice what would be considered a lot of people to interview, and he could have requested not to interview Jane Doe 1. When Christenfeld interviewed Doe 1, they met for around 30 minutes and mostly discussed topics unrelated to her fitness for the program.

With most applicants, the three interviewers would separately evaluate the candidate. Christenfeld suggested that the three interviewers send in their recommendations regarding Jane Doe 1 as a group. Jane Doe 1's academic mentor (the one whose lab space Doe had been using to have sex with Christenfeld) found the suggestion "odd" and believed it was designed so that Christenfeld could "make sure that [Jane Doe 1] did indeed get into the

3

program." The professor explained that "when we did meet as a group, he [Christenfeld] was very positive about her, and I think that then you can persuade people, yes, this is somebody that we—and you're not on paper having said 'I want this graduate student for my own.' " Christenfeld did not evaluate Doe 1 through the department's online system. But when the admissions committee asked for individual rankings, Christenfeld sent an email stating he thought Doe 1 was one of the two best applicants for the graduate program. Jane Doe 1 was accepted into the graduate program.

In the middle of March 2013, after Jane Doe 1 had been admitted, she and Christenfeld met in the afternoon to have sex in the lab space. Afterward, they were lying on the ground fully clothed and talking while Jane Doe 1 waited to hear from a postdoctoral researcher who was visiting from out of town. Doe thought the researcher would call or text first so they could meet to discuss a project, but instead the researcher knocked on the door along with a second person. It took around a minute for Doe 1 to answer the door, and when she opened it she blocked the door from fully opening. Her hair was messy, her face was flushed, the breast area of her tank top was wet, and it appeared to the researcher that she had just had sex. Doe 1 would not let the visitors into the lab and told them she was with Christenfeld analyzing data.

The next day, the visiting researcher told the chair of the psychology department and two other psychology professors about the incident. The chair then reported it to the university's office for the prevention of harassment and discrimination, which began an investigation.

Christenfeld communicated "quite a bit" with Jane Doe 1 about how to handle investigators' questions. The two of them continued to engage in sexual activity. Jane Doe 1 met with the head of the office of prevention of

4

harassment and discrimination to discuss her relationship with Christenfeld. In an effort to protect Christenfeld, she reported that she had not had sexual intercourse in the lab on the day they were discovered there. Doe 1 also misrepresented to the investigator that she was no longer in a relationship with Christenfeld, again in an effort to protect him. Christenfeld also discussed with Jane Doe 1 his own meetings with investigators. They discussed his "clever argument" that Christenfeld did not reasonably have supervisory authority over Jane Doe 1 because she "could be considered outside the social psychology area, in a different area of the psychology department" from Christenfeld.

Two members of the psychology department concluded in a report for the department chair that Christenfeld had not unduly intervened in the admissions process to have Jane Doe 1 accepted into the graduate program. But they found that Christenfeld clearly had engaged in behavior that was ethically and morally questionable, and that at the very least Christenfeld demonstrated poor judgment. They also found that it was unclear whether Christenfeld recognized there was a problem with his behavior. The office for the prevention of harassment and discrimination concluded that it was "a very close call" and that the "violation regarding evaluative authority [was] somewhat technical in nature," but it also concluded that Christenfeld had been dishonest with his colleagues, which "damage[d] the integrity of the [graduate] admissions process." And that turned out to be the case. As Jane Doe 1's former mentor later explained, at least one "graduate student[] drew the conclusion that the way you get into the program is you sleep with a professor and you get in."

In September 2013 Christenfeld and UC San Diego entered into an informal resolution agreement to resolve the complaint (informal agreement).

5

Christenfeld agreed, among other things, not to enter into a romantic or sexual relationship with any student for whom he had or could be expected to have academic responsibility. He also agreed to attend a professional boundaries course, to hold office hours with the door open, and to refrain from holding office hours at campus pubs or other places that serve alcohol. The agreement further provided: "If at any future time, additional credible reports of such behavior on Professor Christenfeld's part (regarding violations of the Faculty Code of Conduct or the UC Policy on Sexual Harassment) are reported to the Office for the Prevention of Harassment and Discrimination, Professor Christenfeld understands and agrees that the EVC [Executive Vice Chancellor] for Academic Affairs will immediately file charges in P&T [Committee on Privilege and Tenure] and recommend discipline up to and including termination, and provide P&T with the June 21, 2013 report and findings already issued by OPHD [the office for the prevention of harassment and discrimination], along with the new credible reports."

As discussed in more detail below, Christenfeld apparently contends that the informal agreement was akin to a settlement or plea agreement, whereby the university was forever precluded from ever pursuing discipline against Christenfeld based on his relationship with Jane Doe 1. Members of the psychology department saw it differently. The chair of the department viewed it as a "you're-on-thin-ice type of statement." The professor who later became department chair considered that Christenfeld "was effectively . . . on probation, that any further incident, then he would be brought up on a recommendation of termination."

Christenfeld and Jane Doe 1 continued to have a sexual relationship after Christenfeld entered into the informal agreement. Christenfeld did not feel that the agreement required him to end his relationship with Doe 1

6

because, as he understood it, the agreement referred only to entering into new relationships. Jane Doe 1 ultimately transferred in August 2015 to a different school on the east coast and by June 2016 had ended her ties with Christenfeld.

The events leading to the discipline that directly gave rise to these proceedings took place in April 2018. According to Christenfeld, he intended to send an email to a woman with whom he communicates almost exclusively electronically. When he addressed the email using his UCSD.edu account, he mistyped a letter of the intended recipient's email address, and the email system auto-filled a different address, that of an undergraduate student (Jane Doe 2), who previously had emailed a final exam to him. The email Christenfeld sent had the subject line "w, now?" and contained two pornographic images. The images showed two different women, both holding erect penises between their exposed breasts.

According to the chair of the psychology department, Jane Doe 2 was "very distraught" and cried when she received the email. She experienced anxiety for which she sought medical treatment. According to an investigative summary of the incident, Jane Doe 2 had planned to take a summer course with Christenfeld but decided against it after receiving his email, which meant she ended up having to enroll in two summer sessions instead of one.

The email was reported to the university's office for the prevention of harassment and discrimination, which investigated. The office notified Christenfeld of the complaint against him in early June, which is the first time he realized he had misaddressed his email. Christenfeld emailed an

apology to Doe 2 and told her he had meant to send the email to his wife.[1] His apology email stated, "I am profoundly sorry for the bewilderment and horror this mistake must have caused, and am filled with shame and remorse. I hope you will accept my heartfelt apology, and that this careless fiasco will not poison your memories of [my] class." An investigator reported that Jane Doe 2 thought Christenfeld should not have sent the apology email, which "also affected her and . . . was 'too much for [her].' "

The chair of the psychology department concluded that Christenfeld's continued interaction with students and continued ability to use university resources created a strong risk of immediate and serious harm to the university community. He recommended that Christenfeld be placed on involuntary leave.

In December 2018 the executive vice chancellor for academic affairs submitted formal charges to the committee on privilege and tenure (disciplinary committee), based both on Christenfeld's relationship with Jane Doe 1 and on his sending the email to Jane Doe 2. The vice chancellor alleged that Christenfeld violated both the University of California's faculty code of conduct and the university's policy on sexual violence and sexual harassment.

The disciplinary committee held a three-day evidentiary hearing in May 2019. Before witnesses testified, Christenfeld's attorney objected that Jane Doe 2 was not appearing as a witnesses and was therefore unavailable

---

[1] Christenfeld later realized that the email in question was in fact intended for another woman. An investigator spoke with the woman Christenfeld said was the intended recipient. She said they did not generally send sexual photos but speculated that Christenfeld might have sent them because she did not know what certain terms meant. The woman did not testify at Christenfeld's disciplinary hearing.

for cross-examination.  The university's attorney stated that Jane Doe 2 was unavailable because she declined to testify and the university lacked subpoena power in administrative proceedings.  The investigator who interviewed Jane Doe 2 also declined to testify, as she had been appointed to be a superior court judge and said she could not ethically testify.  The university's attorney further argued that it was unnecessary in any event to cross-examine Doe 2 because her credibility was not at issue.  The committee chair denied the objection.

Jane Doe 1 testified at the hearing.  She explained that over the previous seven years she had matured, had participated in intensive therapy, and had "come to realize just how unhealthy and unbalanced" her relationship with Christenfeld had been.  She came to believe that they had "what is called in clinical psychology a traumatic bond," which is when someone who is being victimized by someone else actually creates a "very strong bond" with them, similar to the Stockholm syndrome.  Although Christenfeld never "specifically forced" Doe 1 to have sex, there were times she did things with him sexually that she "didn't really want to do" (including "violent things"), which "created a very negative relationship for [her] to sex."  She believed that Christenfeld was a predator who had exploited her.  Doe 1 was concerned that what happened with Jane Doe 2 was caused by her (Doe 1's) failure to have been forthright about her relationship with Christenfeld.  Doe 1 was motivated to testify because she would "feel very guilty" if someone else "f[ell] prey" to Christenfeld if she did not testify truthfully.

Christenfeld also testified at the hearing.  He expressed remorse for his actions and said he apologized to Jane Doe 1.  He claimed, though, that the

9

university was not seeking the truth but instead appeared "to be agenda pushing," which "surprised" him.

The disciplinary committee prepared a 14-page report for the university chancellor. As for Jane Doe 1, the committee found that Christenfeld's behavior violated three provisions of the faculty code of conduct and one provision of the policy against sexual violence and sexual harassment. Specifically, committee members found that by entering into and continuing a relationship with a student interested in social psychology (his area of expertise) and evaluating her application to the graduate program, Christenfeld violated policies prohibiting (1) entering into a romantic or sexual relationship with a student for whom the person has, or reasonably expects to have, academic responsibility (instructional, evaluative, or supervisory), and (2) exercising that academic responsibility. The committee further found that Christenfeld's evaluation of Jane Doe 1 violated a policy prohibiting conflicts of interest and amounted to a serious violation of policies governing professional conduct. As for Jane Doe 2, the committee found that Christenfeld's behavior violated the faculty code of conduct and the sexual harassment policy. Specifically, the committee found that Christenfeld's email to Doe 2 was sexual harassment that created a hostile environment as defined by the university (discussed further below), and the sexual harassment was a serious violation of policies governing professional conduct.

A majority of the committee members endorsed a recommendation that Christenfeld be dismissed and that emeritus status be denied. The Regents ultimately approved the recommendation that Christenfeld be terminated and his emeritus status be denied.

10

Christenfeld filed a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) in the trial court seeking an order directing the Regents to set aside its administrative findings and decision imposed against him. Both his original petition and his first amended petition alleged that because he possessed a vested, fundamental right to his tenured faculty position, he was entitled to have the trial court exercise its independent judgment in reviewing the disciplinary committee's findings (Code Civ. Proc., § 1094.5, subd. (c)). But in his opening brief in support of his petition, Christenfeld argued that the disciplinary committee's findings against him were "not supported by substantial evidence, much less clear and convincing evidence." The Regents' opposition argued that the trial court was to review the disciplinary committee's findings for substantial evidence. Christenfeld's reply brief again asserted that the findings against him were not supported by substantial evidence. In its order denying the petition, the trial court concluded that the committee's findings of policy violations were supported by substantial evidence.

## II.
### DISCUSSION

*A. Christenfeld Was Not Denied a Fair Administrative Hearing.*

    1. The Standard of Review.

For Christenfeld to have prevailed in the superior court on his petition for a writ of administrative mandate, he was required to show that the university "(1) acted without, or in excess of, its jurisdiction, (2) deprived [him] of a fair administrative hearing, or (3) committed a prejudicial abuse of discretion." (*Doe v. Regents of University of California* (2021) 70 Cal.App.5th 521, 532.) "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not

11

supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); see also *Doe* at p. 532.)

Christenfeld first argues he was deprived of a fair disciplinary hearing in several ways. "When reviewing a claim that a petitioner did not receive a fair hearing, we uphold the trial court's decision if it is supported by substantial evidence, but when the evidence is substantially undisputed, the issue becomes a question of law, which we review de novo." (*Doe v. Regents of University of California, supra*, 70 Cal.App.5th at p. 533.)

### 2. Jane Doe 2's Unavailability for Cross-examination Did Not Deprive Christenfeld of a Fair Hearing.

Christenfeld first renews his argument that he was deprived a fair hearing because he was denied the opportunity to cross-examine Jane Doe 2. We are not persuaded.

The university's academic senate bylaws state that parties to disciplinary hearings have the right "to conduct such cross examination as *may be required* for a full and true disclosure of the facts." (Italics added.) Where an accused in university disciplinary proceedings faces serious consequences and findings *are likely to turn on the credibility of the complainant*, the complaining witness must be before the trier of fact so that the person's credibility may be evaluated. (*Doe v. Regents of University of California, supra*, 70 Cal.App.5th at pp. 534–536.)

Christenfeld relies on a series of cases where college students were accused of, but denied, having nonconsensual sexual contact with other students. The courts in those cases concluded that the students had been deprived of a fair hearing because the complainants had not been available before the fact-finders, who thus were unable to assess the complainants' credibility. (*Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 625; *Doe v.*

12

*Allee* (2019) 30 Cal.App.5th 1036, 1039; *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1057–1058.) We agree with the Regents that those cases are distinguishable because Jane Doe 2's credibility was not central to the disciplinary committee's determination. (*Doe v. Regents of University of California, supra,* 70 Cal.App.5th at p. 536.)

The disciplinary committee concluded that Christenfeld's email to Jane Doe 2 violated the University of California's policy against sexual violence and sexual harassment. That policy prohibits sexual harassment, defined as "unwelcome sexual advances, unwelcome requests for sexual favors, and *other* unwelcome verbal, *nonverbal* or physical conduct of a sexual nature when" it creates a hostile environment in that "such conduct is *sufficiently severe* or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs and services of the University and *creates an environment that a reasonable person would find to be intimidating or offensive*." (Italics added.) The committee further found that Christenfeld's conduct violated the faculty code of conduct by committing sexual harassment against a student and by committing a serious violation against professional conduct. Jane Doe 2's credibility was not critical to any of these findings. It was undisputed that the email Christenfeld sent to Jane Doe 2 from his UCSD.edu email address contained pornography. Although it was also essentially undisputed that Christenfeld did not intend to send the email to the student who received it, that does not change the fact that the email was highly inappropriate and that a reasonable person would find it to be offensive. "This is not a 'he-said, she-said' case because the *material* facts are not in dispute." (*Doe v. Regents of University of California, supra,* 70 Cal.App.5th at p. 536, italics added.)

Christenfeld contends that he should have been able to ask Doe 2 "about whether the single errant email unreasonably denied, adversely limited, or interfered with her participation in or benefit from her education, employment or other programs and services of the University, a critical element to a finding of Sexual Harassment as defined by University policy." He disagrees with the disciplinary committee's conclusion that it was undisputed that Doe 2 changed her coursework. He apparently contends that if Jane Doe 2 did not actually change her coursework, he could not have been found to have unreasonably denied, adversely limited, or interfered with Jane Doe 2's participation in or benefit from the university, as set forth in its anti-sexual harassment policy. Not so. Any student who enrolls in college can reasonably expect not to receive unsolicited pornography from a professor. A professor who sends such emails using a university email account should understand that they may be received by a student and, if received, will interfere with that student's education.

The disciplinary committee also focused on Christenfeld's lack of insight into his use of his university email account to send sexually explicit emails. Christenfeld wrote to Jane Doe 2 that he "would never deliberately send you, or any student, any such thing," a reference to the pornographic email. But he "clarified" at the disciplinary hearing that he had been "referring to unsolicited pornographic images, unwelcomed pornographic images." The disciplinary committee stated in its final decision that it "was disappointed that a faculty member would suggest that sending such images from a UCSD email account would be acceptable under different circumstances." As the chair of the psychology department put it, the fact a faculty member who previously had faced discipline then used his university email account to send pornographic images "engage[d] in potential behaviors

14

that could be that reckless would be—would be problematic and indicative of the continued major risk to the university."

In general, "disciplinary proceedings in university settings do not require 'all the safeguards and formalities of a criminal trial' [citation] and a university ' "is not required to convert its classrooms into courtrooms." ' " (*Doe v. Regents of University of California, supra*, 70 Cal.App.5th at p. 534.) Although "the trend in case law has been to expect more adversarial and criminal-trial-like procedures when a student is accused of sexual misconduct and the complainant's credibility is questioned" (*ibid.*), that was not the case here. We thus reject Christenfeld's argument that he was denied a fair hearing because he was unable to cross-examine the recipient of his email containing pornographic images.

### 3. The Charges Relating to Jane Doe 1 Were Not Time-barred or Otherwise Improper.

Christenfeld next argues that disciplinary charges relating to Jane Doe 1 were barred by the university's faculty code of conduct. Again, we are not persuaded.

The code provides that the chancellor must initiate disciplinary action no later than three years after the chancellor is deemed to have known of an alleged violation, defined as when an allegation is first reported to an academic administrator at the level of department chair or above. Because the chair of the psychology department was notified of Christenfeld and Jane Doe 1's relationship in March 2013, Christenfeld reasons, the university was barred from bringing charges based on that relationship more than three years later, in December 2018. This argument is based on an interpretation of the informal agreement that we reject.

15

As we have recounted, the agreement provided that "[i]f at any future time, additional credible reports of such behavior on Professor Christenfeld's part (regarding violations of the Faculty Code of Conduct or the UC Policy on Sexual Harassment) are reported to the Office for the Prevention of Harassment and Discrimination, Professor Christenfeld understands and agrees that the EVC [Executive Vice Chancellor] for Academic Affairs will immediately file charges in P&T [Committee on Privilege and Tenure] and recommend discipline up to and including termination, and provide P&T with the June 21, 2013 report and findings already issued by OPHD [the office for the prevention of harassment and discrimination], along with the new credible reports." Christenfeld contends that under this agreement he "did not expressly or implicitly waive his right" to be protected by the statute of limitations, and the agreement authorized the vice chancellor to file charges based on *new* alleged violations. But the vice chancellor is *always* authorized to bring charges based on new reports of violations. The agreement contemplated that when any new credible reports of misbehavior were received, the executive vice chancellor could *immediately* recommend discipline "up to and including termination," without reference to the seriousness of any future reports, an indication that a new complaint could be based on the prior conduct.

A contract must be interpreted in a way as to make it reasonable and capable of being carried into effect. (Civ. Code, § 1643.) The disciplinary committee concluded that "[i]mposing an external three year limitation on the agreement would alter the plain meaning of the language and defeat the purpose of the agreement (to ensure that the behavior is not repeated)." The trial court likewise concluded that, "[f]airly read, the Agreement placed [Christenfeld] on notice that future acts of misconduct could subject him to

16

discipline including termination for his misconduct in 2013, and for subsequent misconduct." Reviewing the agreement de novo as there was no conflicting extrinsic evidence as to its meaning (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1497–1498), we agree. And because we find no ambiguity in the agreement, we also reject Christenfeld's argument that any ambiguity should be interpreted in his favor (Civ. Code, § 1654).

We likewise reject Christenfeld's related argument that to the extent the university was permitted to pursue charges related to Jane Doe 1, the scope of those charges was impermissibly expanded beyond his role in evaluating Doe 1's application for admission into UC San Diego's graduate program. We agree with the Regents that this is simply another way of claiming that the university filed time-barred charges against him. And we agree with the two chairs of the psychology department who considered Christenfeld to be on a form of probation under the informal agreement. Once he was accused of additional misconduct, the university was entitled under its procedures and the informal agreement to pursue the charges it pursued.

Christenfeld briefly contends that his disciplinary hearing "was essentially a smear campaign and a forum for the University to shame [him] and police faculty and graduate student morality." Aside from this statement providing further evidence that Christenfeld continues to minimize his behavior and its effect on Jane Doe 1, it provides no support for issuing a writ of mandate. "An administrative agency is not required to observe the strict rules of evidence enforced in the courts, and the admission or rejection of evidence is not ground for reversal unless there has been a denial of justice." (*McCoy v. Board of Retirement* (1986) 183 Cal.App.3d 1044, 1054.) There being no such denial of justice here, we reject Christenfeld's arguments.

17

*B. Substantial Evidence Supports the Disciplinary Committee's Findings.*

Christenfeld next argues that the disciplinary committee's findings were supported by insufficient evidence. The parties disagree both about the standard of review and about whether there was sufficient evidence supporting the committee's conclusions. We agree with the Regents that we review the findings for substantial evidence and that they are supported by such evidence.

1. The Standard of Review.

Where an administrative decision does not involve a fundamental vested right, the trial court reviews the record to determine whether the findings and decision are supported by substantial evidence. (*Doe v. Regents of University of California, supra,* 70 Cal.App.5th at pp. 532–533; Code Civ. Proc., § 1094.5, subd. (b).) But where an administrative decision affects a "vested, fundamental right[]," the trial court "exercises its independent judgment upon the evidence disclosed [before the administrative body] in a limited trial de novo." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143; Code Civ. Proc., § 1094.5, subd. (c).) "The courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review." (*Bixby* at p. 144.)

Unlike in his briefs on the merits in the trial court, Christenfeld now argues that that he possessed a fundamental vested right to his tenured professorship and was thus entitled to a limited trial de novo. (E.g., *Turner v. Board of Trustees* (1976) 16 Cal.3d 818, 825 ["a tenured teacher possesse[s] a vested right to be retained"].) He is mistaken. "[U]nder the California Constitution, article IX, section 9, the University as a

constitutionally created state institution has been delegated the quasi-judicial power to conduct its own administrative decisionmaking on staff employment matters." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1477–1478; see also *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34–35 [independent-judgment review inapplicable to "agencies of constitutional origin which have been granted limited judicial power by the Constitution itself"].) We thus review the disciplinary committee's decision for substantial evidence. There is a strong presumption as to its correctness and "[w]e do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the [university's] decision. Its findings come before us 'with a strong presumption as to their correctness and regularity.' " (*Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701.)

Even if Christenfeld had been entitled to a less deferential standard of review in the trial court, there is no indication that the result would have been different. In its order denying Christenfeld's petition, the trial court stated it "disagree[d] in the strongest terms" with Christenfeld's argument that his conduct was "benign." This suggests that the trial court did not consider this a close case. Neither do we. The evidence supports the committee's findings.

### 2. Substantial Evidence Supports the Disciplinary Committee's Findings Regarding Jane Doe 1.

The disciplinary committee concluded that Christenfeld's evaluation of Jane Doe 1 for the graduate program at UC San Diego violated four university policies. Specifically, the conduct violated policies against (1) entering into a romantic or sexual relationship with any student for whom the faculty member has or reasonably should expect to have academic

19

responsibility (instructional, evaluative, or supervisory), (2) exercising such academic responsibility, and (3) violating policies against professional conduct. The committee also concluded that Christenfeld violated the anti-sexual harassment policy barring conflicts of interest where a faculty member engages in a decision affecting a person with whom a faculty member has a romantic or sexual relationship.

Christenfeld stresses that when he originally entered into a relationship with Jane Doe 1 he did not have academic responsibility over her. In making this argument, he quotes selectively from investigatory memos prepared after the relationship was first discovered and suggests they somehow absolved him of any wrongdoing. To the contrary, one concluded that Christenfeld's behavior posed ethical and moral issues and evinced poor judgment, and the other stated that Christenfeld had been dishonest and did not fully appreciate the problem with his conduct.

The remainder of Christenfeld's arguments amount to casting the evidence in the light most favorable to him. He quibbles about when Jane Doe 1 became interested in social psychology, his field of expertise. He also repeats his argument that he did not violate the informal agreement because it barred him only from entering into a new relationship, not from continuing his relationship with Doe 1. None of these arguments undermine the committee's ultimate conclusion, in light of all the evidence, that Christenfeld was in a relationship with someone over whom he should reasonably have expected to have academic responsibility.

Christenfeld characterizes his role in evaluating Jane Doe 1 for admission to the graduate program as a "[m]arginal [v]iolation" of the faculty code of conduct and again summarizes the evidence in the light most favorable to him, downplaying the seriousness of the role he played. Giving

the deference we must to the disciplinary committee's findings, we cannot agree.

### 3. Substantial Evidence Supports the Disciplinary Committee's Findings Regarding Jane Doe 2.

We must also defer to the disciplinary committee's findings that Christenfeld's sending pornographic images to Jane Doe 2 amounted to sexual harassment in violation of the university polices against sexual harassment. Again, we conclude that the committee's conclusions were supported by substantial evidence.

As he did at his discipline hearing, Christenfeld characterizes the message he sent as an "errant email." He acknowledges that the email contained "sexually graphic images" but contends that it was not sent "with any sexual intent of subtext [*sic*]," and the sexual content was not "severe." And he claims that a reasonable undergraduate student would not have found the email to be "intimidating or offensive," in violation of the university's anti-harassment policies. In support of this assertion, he points to the testimony at his hearing that another professor teaches a course on human sexuality. As part of that course, students are shown videos of people masturbating and having anal sex, and the textbook is a "sex manual." Presumably students who sign up for a course in human sexuality would know *in advance* that they would view explicit images, and they would reasonably expect that those images would be presented with appropriate context and for a legitimate educational purpose. This is far different from receiving unsolicited sexually graphic images from a professor sent from a university email account. Like the trial court, we disagree "in the strongest terms" with Christenfeld's argument that his behavior was benign, or that

21

that a reasonable undergraduate student would not be "intimidated or offended" by his email.

Considering all the evidence in the light most favorable to the Regents, we conclude that substantial evidence supports the disciplinary committee's findings that Christenfeld's conduct with respect to Jane Doe 2 violated university policies.

### C. The Regents Did Not Abuse Its Discretion When It Fired Christenfeld and Denied Him Emeritus Status.

Lastly, Christenfeld argues that his dismissal and the denial of emeritus status was "an overly severe sanction" and asks us to set it aside. (Bold and capitalization omitted.) He acknowledges that we review the sanction for an abuse of discretion. That is, " '[n]either a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed.' " (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692.) "Moreover, '[i]t is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.' " (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1106.)

Although reasonable minds might differ about the appropriateness of Christenfeld's discipline, we cannot say under the appropriate standard that it amounted to an abuse of discretion.

## III.
### DISPOSITION

The judgment is affirmed. The Regents shall recover costs on appeal.

_____

Humes, P.J.


WE CONCUR:




_____

Margulies, J.




_____

Devine, J. *




    *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*Christenfeld v. Regents of The University of California*  A162690


23